Filed 3/5/21  Marriage of Jia & Liu CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re Marriage of LEI JIA and WEI ZHI LIU. | B299976 |
| LEI JIA,<br><br>          Respondent,<br><br>     v.<br><br>WEI ZHI LIU,<br><br>          Appellant. | (Los Angeles County Super. Ct. No. BD651575) |

APPEAL from a judgment and orders of the Superior Court of Los Angeles County.  Mark H. Epstein and Steve Cochran, Judges.  Affirmed.

Aijun Zhang for Appellant.

C. Stephanie Chen; and Lei Jia, in pro. per. for Respondent.

_____

Lei Jia and Wei Zhi Liu appeal and cross-appeal from a judgment rendered in connection with their acrimonious dissolution proceedings. In a 30-page statement of decision, the trial court decided numerous issues related to the valuation and distribution of their marital property. In a separate order, the trial court awarded attorney fees to Jia under the Family Code. Liu and Jia both assert there is insufficient evidence to support the trial court's findings and award of attorney fees. We conclude substantial evidence supports the trial court's findings, the court did not abuse its discretion to value and order the distribution of marital property as it did, and the award of attorney fees was appropriate. We affirm.

## FACTS

Liu and Jia were married on October 11, 2011, and they separated on December 13, 2016. During the dissolution proceedings, the parties' dispute centered on the distribution and valuation of real property located in Temple City (Temple City property) and Arcadia (Arcadia property) as well as the real estate company incorporated by Liu during their marriage, Guangsha Investment, Inc. (Company). Additionally, the parties alleged each breached his or her fiduciary duty to the other by improperly transferring hundreds of thousands of dollars to third parties or making noncommunity expenditures.

After six days of trial and opportunity for the parties to comment on its rulings, the court issued a comprehensive 30-page final statement of decision on June 14, 2019. It reserved the issue of attorney fees, setting forth a deadline for the parties to file a request for order. The trial court ordered Jia's counsel to prepare a final judgment. Liu appealed from the final statement of decision on August 13, 2019.

2

On August 22, 2019, the trial court awarded Jia $56,313.76 in attorney fees and costs and $5,000 in expert fees pursuant to Family Code section 271.  The trial court further awarded Jia $3,549.00 for fees and costs under Family Code section 1101.  Liu appealed from the attorney fees and costs award on November 27, 2019.

On January 27, 2020, the judgment in the dissolution matter was filed and entered by the trial court.  On February 11, 2020, Jia filed a notice of cross-appeal from the judgment.  Liu's appeal of the attorney fees and costs award was consolidated with this case by order dated March 11, 2020.

## DISCUSSION

### I.    Motions to Dismiss

We first address the competing motions to dismiss that were filed by the parties.  Both motions are denied.[1]

Jia contends Liu's appeal from the final statement of decision rather than the judgment should be dismissed because a statement of decision is not an appealable order.  (*Alan v. American Honda Motor Co., Inc.* (2007) 40 Cal.4th 894, 901 ["a statement of decision is not treated as appealable when a formal order or judgment does follow"].)  While Jia is correct Liu appealed from a nonappealable order, we "may treat a notice of appeal filed after the superior court has announced its intended ruling, but before it has rendered judgment, as filed immediately after entry of judgment."  (Cal. Rules of Court, rule 8.104(d).)  Jia

---

[1]    The parties also seek to amend or correct their notices of appeal for various typographical or other errors.  The motions to amend, filed by Jia on March 3, 2020, and by Liu on October 7, 2020, are denied.

3

does not contend she was misled as to what orders or judgments were encompassed by Liu's appeal or that she was prejudiced in any way by his premature appeal. Because we must liberally construe a notice of appeal in favor of its sufficiency, we exercise our discretion to treat Liu's notice of appeal as filed immediately after entry of judgment. (*Walker v. Los Angeles County Metropolitan Transportation Authority* (2005) 35 Cal.4th 15, 20; *Grossman v. Davis* (1994) 28 Cal.App.4th 1833, 1838, fn. 1; Cal. Rules of Court, rule 8.100(a)(2).)

Liu contends Jia's cross-appeal should be dismissed because it was untimely. Liu tethers the time to appeal to the date of the final statement of decision rather than the judgment. Based on this date, he contends his appeal was timely and Jia's cross-appeal was untimely under California Rules of Court, rule 8.108(g), which specifies: "If an appellant timely appeals from a judgment or appealable order, the time for any other party to appeal from the same judgment or order is extended until 20 days after the superior court clerk serves notification of the first appeal."

Jia's notice of cross-appeal was filed on February 11, 2020, more than 20 days after the superior clerk court served her with notification of Liu's first appeal on August 15, 2019. As discussed above, however, the final statement of decision is not an appealable order and we exercise our discretion to treat Liu's notice of appeal as if it was filed immediately after the judgment. By our calculation, then, Jia's February 11, 2020 notice of cross-appeal was filed within 20 days after the date judgment was entered—January 27, 2020. It is therefore timely.

4

## II. Standards of Review

The standards of review applicable to a divorce proceeding are well established. "[I]n a proceeding for dissolution of marriage or for legal separation of the parties, the court shall, . . . divide the community estate of the parties equally." (Fam. Code, § 2550.) We review a trial court's decisions regarding valuation and distribution of community property for abuse of discretion. (*In re Marriage of Sivyer-Foley & Foley* (2010) 189 Cal.App.4th 521, 526.) "The trial court possesses broad discretion to determine the value of community assets as long as its determination is within the range of the evidence presented. [Citation.] The valuation of a particular asset is a factual question for the trial court, and its determination will be upheld on appeal if supported by substantial evidence in the record. [Citation.]" *(In re Marriage of Nichols* (1994) 27 Cal.App.4th 661, 670.)

To the extent the parties challenge the sufficiency of the evidence to support the trial court's other factual findings, our review is also for substantial evidence. (*Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1053 (*Bickel*); *In re Marriage of Mix* (1975) 14 Cal.3d 604, 614.) Under those well-known principles, " ' "the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted," to support the findings below. [Citation.] We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor . . .' [Citation.]" (*Bickel, supra*, at p. 1053.) In judging whether substantial evidence supports the trial court's findings, appellate courts do not reweigh evidence or reassess the

5

credibility of witnesses.  (*In re Marriage of Balcof* (2006) 141 Cal.App.4th 1509, 1531 (*Balcof*).)

In five appellate briefs spanning hundreds of pages, both parties attempt to reargue the "facts" as they see them, an argumentative presentation that disregards the admonition that they are not to "merely reassert [their] position at . . . trial." (*Conderback, Inc. v. Standard Oil Co.* (1966) 239 Cal.App.2d 664, 687; accord, *Albaugh v. Mt. Shasta Power Corp.* (1937) 9 Cal.2d 751, 773.)  This "factual presentation is but an attempt to reargue on appeal those factual issues decided adversely to [him or her] at the trial level, contrary to established precepts of appellate review.  As such, it is doomed to fail." (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 398–399.)

We also note that though both litigants are self-represented,[2] they are held to the same standards as a party represented by counsel.  "[M]ere self-representation is not a ground for exceptionally lenient treatment." (*Rappleyea v. Campbell* (1994) 8 Cal.4th 975, 984.)  Parties who represent themselves must adhere to the same restrictive rules of procedure as attorneys.  (*Id.* at pp. 984–985.)  Thus, a self-represented litigant is subject to forfeiture of an issue just as an attorney would be:  " 'An appellate court will ordinarily not consider procedural defects or erroneous rulings, in connection with relief sought or defenses asserted, where an objection could have been but was not presented to the lower court by some appropriate method . . . .' " (*Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 184, fn. 1; see also, e.g., *Haywood  v. Superior Court* (2000) 77 Cal.App.4th 949, 957, fn. 6.)

---

[2]     Liu retained counsel to represent him at oral argument.

## III.   The Temple City Property

Liu purchased the Temple City property in January 2011, nine months before he married Jia.  He made a down payment of $88,000 and made $2,694 in principal payments from his separate property for a total of $90,694.  When Liu proposed to Jia, he offered to add her to the grant deed as a wedding gift.  The transfer was formally recorded on October 14, 2011.  After their marriage, the mortgage was paid from community assets.  The trial court found Liu was entitled to recover the $90,694 he contributed to the Temple City property prior to marriage.  The trial court also assessed charges against Liu for his exclusive use of the property after the date of separation pursuant to *In re Marriage of Watts* (1985) 171 Cal.App.3d 366, 373–374 (*Watts*).  Liu and Jia both challenge the trial court's rulings associated with the Temple City property.[3]  We conclude reversal is not required.

### A.  Liu Has Forfeited His Argument the Appreciation in Value of the Temple City Property Should Be Included in the Reimbursement Calculation

Lui asserts the Temple City property increased in value by $43,000 from the time he purchased it to the time he added Jia to the deed.  He contends the trial court erred when it failed to include the appreciated value to calculate his reimbursement

---

[3]     In his reply brief, Liu argues the trial court erred when it upheld the interspousal transfer because it was conducted with "undue influence" in violation of Family Code section 721, subdivision (b) since it advantages Jia at the expense of Liu.  According to Liu, no one informed him of the impact the transfer would have if the couple divorced.  "[P]oints raised for the first time in a reply brief on appeal will not be considered." (*Nordstrom Com. Cases* (2010) 186 Cal.App.4th 576, 583.)

7

amount.  Liu has forfeited this argument for failure to raise it below.

Liu contends he has not forfeited the issue because he requested reimbursement under Family Code section 2640, which automatically includes any appreciation earned prior to the conversion to community property.[4]  Further, Liu cites to a trial exhibit prepared by his expert that sets forth a $43,000 increase in value for the Temple City property from January 2011 to October 2011.

Liu does not direct us to any portion of the record that shows he requested the trial court include the appreciated value in its calculation for reimbursement.  Indeed, the trial court expressly held the statute provided that any reimbursement was "without interest or adjustment for appreciation."  Thus, the court's calculation did not include the appreciated value.  Although Liu objected to the court's proposed statement of decision on other grounds, he did not object on this ground or otherwise direct the court's attention to this purported error.  Accordingly, he may not now contend he is entitled to include the appreciated value in calculating his separate property interest in the Temple City property.  (*In re Marriage of Arceneaux* (1990) 51

---

[4]     Although we need not address whether the appreciation in value may be included in the reimbursement calculation, we note Family Code section 2640, subdivision (b) specifies:  "the party shall be reimbursed for the party's contributions to the acquisition of property of the community property estate to the extent the party traces the contributions to a separate property source.  *The amount reimbursed shall be without interest or adjustment for change in monetary values* and may not exceed the net value of the property at the time of the division."  (Italics added.)

Cal.3d 1130, 1132 [appellant waived his objection to any errors in the statement of decision when he failed to object to its alleged deficiencies]; *Avalos v. Perez* (2011) 196 Cal.App.4th 773, 776 [a party forfeits his or her claim of error by not bringing the error to the trial court's attention in a timely manner].)

### B. Substantial Evidence Supports Reimbursement of Liu's Separate Property Contribution

Jia contends Liu was not entitled to reimbursement under Family Code section 2640 for his separate property contribution to the Temple City property because it was a gift to her upon their marriage. By Jia's calculation, the gift included the amounts spent by Liu prior to marriage to acquire the property. We disagree.

Family Code section 2640, subdivision (b) provides reimbursement for separate property "unless a party has made a written waiver of the right to reimbursement or has signed a writing that has the effect of a waiver . . . ." We agree with the trial court that there is no writing indicating Liu intended to waive his right to reimbursement under Family Code section 2640. Further, Jia has presented no authority that holds the deed stating the transfer was a gift constitutes a written waiver under Family Code section 2640, subdivision (b). Jia failed to demonstrate prejudicial error on this issue. (*In re Marriage of McLaughlin* (2000) 82 Cal.App.4th 327, 337.)

### C. Substantial Evidence Supports the *Watts* Charge

Liu next challenges the trial court's calculation of the *Watts* charges for his exclusive use of the Temple City property during the 28 months between separation and trial. A *Watts* charge is applicable when one spouse has exclusive use of an asset between separation and trial and must reimburse the community for the

9

reasonable value of that use.  (*In re Marriage of Garcia* (1990) 224 Cal.App.3d 885, 890; *Watts, supra,* 171 Cal.App.3d at pp. 373–374.)

At trial, Jia testified she searched the MLS system to conclude the fair rental value for the Temple City property was $2,600 per month.  Liu estimated the fair rental value to be between $2,000 and $2,300 per month.  Both Jia and Liu hold real estate licenses.  The trial court, however, credited Jia's testimony because she demonstrated she conducted research to support her estimate of the fair rental value of the Temple City property while Liu did not.  Jia's testimony constitutes substantial evidence of the fair rental value of the Temple City property.  We decline to second guess the trial court's decision to credit Jia's testimony rather than Liu's.  (*Balcof*, *supra,* 141 Cal.App.4th at p. 1531.)

Liu attempts to disqualify Jia's testimony, asserting she was not qualified as an expert to testify to the fair rental value of the Temple City property.  It is well established, however, that the value of a property may be shown by the property owner's testimony.  (Evid. Code, § 813, subd. (a).)

Relying on *In re Marriage of Garcia*, *supra,* 224 Cal.App.3d at page 891, Liu also argues he should not be charged under *Watts* because he paid all the mortgage and other costs of the Temple City property after separation.  This argument is meritless.  A spouse may offset *Watts* charges with what are known as *Epstein* credits:  "where the asset is not owned outright by the community but is being financed, and the monthly payments equal or exceed the reasonable value of the asset's use, the spouse may satisfy the duty to compensate the community for use of the asset by making the monthly finance payments from

10

his or her separate property." (*In re Marriage of Garcia, supra*, 224 Cal.App.3d at pp. 890–891.) Thus, "[w]here a spouse with exclusive use of a community asset after separation makes the monthly finance payments on the asset, he or she is not required to further compensate the community for use of the community asset where the monthly finance charges equal or exceed the reasonable value of said use each month and the paying spouse does not obtain *Epstein* credits for the monthly payments." (*Id.* at p. 891.) Because Liu received *Epstein* credits for his payments, he was appropriately subject to *Watts* charges for his exclusive use of the Temple City property.

We likewise reject Liu's contention that the *Watts* charges should be reduced by one third due to his separate property interest in the Temple City property. As described above, Liu was reimbursed for his contribution to the purchase of the Temple City property. Thus, he cannot claim to own any part of the Temple City property as separate property.

## IV.    The Arcadia Property

Jia and Liu purchased the Arcadia property in December 2012 for $617,000, intending to build a new home on it. After they separated, Jia lived in the Arcadia property. Liu contends the trial court erred when it determined Jia was entitled to reimbursement for her contribution of separate property towards the purchase price. Liu also challenges the trial court's valuation of the property and the *Watts* charge against Jia's use of the property.

11

## A. Substantial Evidence Supports Reimbursement to Jia of Her Contribution to the Purchase of the Arcadia Property

Liu contends the evidence shows Jia did not contribute any noncommunity funds to the purchase of the Arcadia property. Liu's argument relies on highlighting the deficiencies in Jia's testimony and evidence at trial. He merely asks us to reweigh the evidence, which we may not do. (*Balcof, supra,* 141 Cal.App.4th at p. 1531.) We conclude Jia's testimony and evidence at trial constitute substantial evidence to support the trial court's finding.

A "party shall be reimbursed for the party's contributions to the acquisition of property of the community property estate to the extent the party traces the contributions to a separate property source. The amount reimbursed shall be without interest or adjustment for change in monetary values and may not exceed the net value of the property at the time of the division." (Fam. Code, § 2640, subd. (b).) "Generally speaking such post-marital property can be established to be separate property by two independent methods of tracing. The first method involves direct tracing. . . . The second method involves consideration of family expenses." (*In re Marriage of Mix, supra,* 14 Cal.3d at p. 612.) The family expenses method "is based upon the presumption that family expenses are paid from community funds. [Citation.] If at the time of the acquisition of the property in dispute, it can be shown that all community income in the commingled account has been exhausted by family expenses, then all funds remaining in the account at the time the property was purchased were necessarily separate funds. [Citation.]" (*Ibid.*)

12

At trial, Jia claimed she contributed $36,980 in separate property to the $200,000 down payment for the Arcadia property. Liu claimed a $7,000 separate property contribution. Jia, who is a certified public accountant, testified she used the "family expenses" method to trace the source of the funds used for the down payment. She explained her Bank of America account contained $37,895 when she married Liu. She then listed the deposits and withdrawals for that account during marriage, showing community expenses had exhausted the community funds in the account at the time they purchased the Arcadia property. As a result, a portion of the remaining funds used to purchase the property were necessarily her separate funds. Liu cross-examined her on the topic. The trial court admitted into evidence trial exhibit 47, which set forth the tracing analysis conducted by Jia regarding her contribution to the down payment. Liu confirmed he received the underlying bank statements on which trial exhibit 47 was based. Indeed, the bank statements were later admitted into evidence.

The trial court found Jia's tracing analysis to be appropriate and Liu had failed to undermine her methodology during cross-examination. It further declined to reimburse Liu for his claimed $7,000 contribution because Liu did not conduct any tracing to support his claim. Exhibit 47, which was admitted without objection, and Jia's testimony constitute substantial evidence to support the trial court's finding that she used $36,980 in separate property to aid in the purchase of the Arcadia property. Jia was thus entitled to reimbursement.

Liu disagrees with the trial court's view of the evidence. He argues Jia failed to demonstrate the community income was exhausted at the time of purchase because trial exhibit 47

13

showed a balance of $70,775 as of October 23, 2012. According to Liu, this proved the community funds were not exhausted at the time they purchased the Arcadia property because the balance was more than $36,980. We disagree. The balance appears to show the parties had $70,775 available to contribute towards their $200,000 down payment, of which $36,980 was Jia's separate property. Indeed, the trial court specifically questioned Jia about the account balance listed in trial exhibit 47. She explained it was merely for reference purposes and the trial court accepted that answer. On cross-examination, Liu did not question Jia about the $70,775 balance. He may not on appeal question Jia's tracing methodology when he failed to do so at trial.

Liu also faults Jia for failing to specify whether each expenditure on trial exhibit 47 was for community or noncommunity purposes. The presumption that funds in a commingled account are community property also applies to expenditures using funds withdrawn from a commingled account. (*In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 100.) Liu was unable to overcome the presumption that they were community expenses; as discussed below, the trial court determined Jia did not breach her fiduciary duty to him by withdrawing community funds for noncommunity purposes.

### B. Substantial Evidence Supports the *Watts* Charge

Jia lived in the Arcadia property while they were separated. Jia testified the kitchen and one bathroom were inoperable due to plumbing issues, the roof leaked, the heating did not work, and the foundation was cracked. Jia also testified the Arcadia property could not be rented because it was in such poor condition. Nevertheless, she equated the rental value of the

14

Arcadia property with renting a bedroom and a bathroom in someone's home. She explained those were the only two rooms that were usable in the house. She estimated the rental value to be $600 per month. Liu's expert testified to the average rent per square foot of a home in Arcadia without considering the poor condition of the property. He estimated a rental value of $2,569 to $3,053 per month for the Arcadia property. The trial court disregarded Liu's expert's analysis, finding it "off base." The trial court instead credited Jia's testimony. The trial court had discretion to accept or reject any expert opinion. (*In re Marriage of Rosen* (2002) 105 Cal.App.4th 808, 820.) As a result, Jia's testimony constituted substantial evidence of the trial court's finding regarding the *Watts* charge for the Arcadia property.

Liu argues on appeal the trial court should have disregarded Jia's testimony because it was presented on rebuttal after both parties had presented their case-in-chief. Liu argues this procedural "irregularity" prejudiced him but fails to explain how. Neither does he present any legal authority that would render her testimony inadmissible on this basis. He has failed to meet his burden to demonstrate prejudicial error. (*In re Marriage of McLaughlin, supra,* 82 Cal.App.4th at p. 337.)

Liu also contends the trial court failed to comply with its own formula for calculating the fair rental value of the Arcadia property. He specifically relies on the trial court's observation that "[t]he proper analysis . . . would be to determine what would need to be done to bring the property into a condition in which it could be rented. Then one could determine the rental value based on the property as repaired multiplied by the number of months at issue and subtract the cost of repair. . . . No one did that type of analysis, however."

15

Liu contends Jia's expert offered testimony that it would cost $8,000 to repair the property. As a result, he argues the trial court should have abided by its own formula by subtracting the $8,000 figure provided by Jia's expert from the rental estimate provided by his expert. This argument is meritless. Jia's expert opined it would cost "$8,000 just [to] make [it into] usable condition, [he did] not consider [an] update to the current market condition." Thus, Jia's expert did not testify it would cost $8,000 to repair the house to a condition where it could be rented for $2,600 a month. Moreover, the trial court refused to credit Liu's expert's testimony, finding it was "off base." The trial court did not abuse its discretion to order *Watts* charges against Jia in the amount of $600 per month.

## C. Substantial Evidence Supports the Trial Court's Valuation

Liu next argues the evidence was insufficient to support the trial court's valuation of the Arcadia property. The record reveals otherwise. At trial, Jia's appraiser estimated the Arcadia property was worth $700,000 and Liu's appraiser valued it at $1,000,000. The trial court found fault with both appraisers' valuations. In particular, the homes used by the appraisers were not entirely comparable to the Arcadia property. Jia's appraiser used a home that was located in a less desirable school district. Liu's appraiser chose homes that were in better condition than the Arcadia property. As a result, the trial court averaged the appraisers' comparable homes and arrived at a valuation of $884,440.

Liu argues the trial court was not allowed to simply average the appraisals and indicated the trial court had to accept one of the estimates provided by the experts. Liu provides no

16

legal authority that would require us to so limit the trial court's fact-finding ability. We conclude the trial court did not abuse its discretion to calculate the value of the Arcadia property in this way and substantial evidence supported its finding.

## V.     The Company

Liu became a licensed real estate agent in 2007. He worked for Long Dragon Realty Group, Inc. during his marriage with Jia. In 2014, Liu incorporated the Company to receive his commission checks from Long Dragon Realty. At trial, the parties presented expert testimony regarding the Company's value. Liu contends there is insufficient evidence to support the trial court's valuation of the Company. The record shows otherwise.

### A.  Substantial Evidence Supports the Trial Court's Goodwill Valuation

Liu first challenges the trial court's reliance on Jia's expert's $139,000 valuation of the Company's goodwill. Both experts used the excess earnings approach to value the Company's goodwill. The trial court noted the gross revenue numbers were "relatively straightforward" and the parties agreed on at least some of the net operating income numbers.

"The 'goodwill' of a business is the expectation of continued public patronage." (Bus. & Prof. Code, § 14100.) However, there is more to goodwill than expectation of continued patronage. "The goodwill of a business is property and is transferable." (Bus. & Prof. Code, § 14102.) The excess earning method has been used to calculate the value of a business's goodwill for purposes of a marital dissolution. (*In re Marriage of Rosen, supra,* 105 Cal.App.4th at p. 818.)

Liu argues the Company lacked any goodwill value because it was created solely as a repository for his commission checks

17

from Long Dragon Realty.  According to Liu, the clients he services belong to Long Dragon Realty and the Company otherwise lacks assets or employees.  As a result, any goodwill the Company holds is personal goodwill based on Lui's own earning capacity, personal skill, and reputation.  Personal goodwill is not property subject to distribution in a dissolution proceeding.  (*In re Marriage of McTiernan & Dubrow* (2005) 133 Cal.App.4th 1090, 1102.)

Again, Liu has forfeited this argument for failure to raise it at trial.  (*Avalos v. Perez, supra,* 196 Cal.App.4th at p. 776.)  In its statement of decision, the trial court noted, "Mr. Liu now contends that there is no goodwill as a matter of law.  It is too late, however, to raise that issue.  And, in any event, both experts disagree with him, as does the Court."  Indeed, Liu presented expert testimony regarding the value of the goodwill held by the Company.

Alternatively, Liu argues any goodwill held by the Company was generated before the marriage, rendering it entirely separate property and not subject to division.  Neither of the cases relied upon by Liu—*In re Marriage of Rives* (1982) 130 Cal.App.3d 138 and *In re Marriage of Koester* (1999) 73 Cal.App.4th 1032—stand for this proposition.  In each, a business created prior to marriage, even if characterized as separate property, was nevertheless subject to valuation and appropriate division according to established rules.  Neither case held the business was the separate property of one spouse and not subject to division.  (*In re Marriage of Rives, supra,* 130 Cal.App.3d at p. 151; *In re Marriage of Koester, supra,* 73 Cal.App.4th at p. 1036.)

Lastly, Liu contends the value of the goodwill adopted by the trial court was not supported by substantial evidence.  Liu finds fault with the expert testimony presented by Jia on the subject.  He contends the entirety of the expert testimony on the

topic, including testimony from his own expert, should be disregarded and the goodwill of the Company should be valued at zero. Again, Liu merely urges us to judge credibility and reweigh the evidence. We decline to do so. (*Balcof, supra,* 141 Cal.App.4th at p. 1531.)

In her cross-appeal, Jia similarly argues against the outcome proposed by her own expert. Jia argues the trial court was wrong to adopt her expert's valuation because the court's own calculation of goodwill exceeded her expert's number by $7,318. We agree with the trial court that "this is not a huge difference" and conclude it did not abuse its discretion to adopt the slightly more conservative number. Error, if any, was invited by Jia as she was the one who set forth this valuation at trial. (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 403.) Jia has also forfeited this issue, having failed to object or raise it with the trial court below. (*Avalos v. Perez, supra,* 196 Cal.App.4th at p. 776.)

## B. The Trial Court Did Not Abuse Its Discretion to Include Checks Dated After Separation in the Company's Valuation

Liu asserts the trial court erred when it included two commission checks dated January 31, 2017, in the valuation of the Company because there was no evidence those commissions were earned prior to the date of separation, December 13, 2016. We conclude the trial court did not abuse its discretion to add these checks to the tangible assets of the Company to be distributed.

At trial, Jia included three commission checks that were issued after the date of separation in her valuation of the Company. Two commission checks for $9,320 and $16,020 were

19

dated January 31, 2017, and one check for $12,820 was dated February 8, 2017.  The trial court acknowledged there was no evidence about the transactions to which these checks related.  The trial court added the two January checks to the tangible assets of the Company but found the February check to be too distant from the date of separation to credit to the community.

Ordinarily, "a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting."  (Evid. Code, § 500.)  However, " ' "[w]here the evidence necessary to establish a fact essential to a claim lies peculiarly within the knowledge and competence of one of the parties, that party has the burden of going forward with the evidence on the issue although it is not the party asserting the claim." [Citations.]' [Citation.]" (*Amaral v. Cintas Corp. No. 2* (2008) 163 Cal.App.4th 1157, 1189; see also *In re Marriage of Prentis-Margulis & Margulis* (2011) 198 Cal.App.4th 1252, 1267; *Wolf v. Superior Court* (2003) 107 Cal.App.4th 25, 35, ["where essential financial records are in the exclusive control of the defendant who would benefit from any incompleteness, public policy is best served by shifting the burden of proof to the defendant, thereby imposing the risk of any incompleteness in the records on the party obligated to maintain them"].)

Given the checks were issued over a month after the parties separated and cashed months after that, the knowledge of which transactions they related to was peculiar to Liu.  Thus, he had the burden to show they were earned after December 13, 2016.  He did not do so.  The trial court did not abuse its discretion to add the January 31, 2017 checks to its valuation of the Company.

## VI. Breach of Fiduciary Duty

At trial, both parties asserted the other misappropriated assets from the community in violation of Family Code section 1101. Along with numerous other withdrawals, Liu alleged Jia improperly transferred $30,000 to her brother shortly before they separated. Jia, in turn, accused Liu of misappropriating hundreds of thousands of dollars from the community by siphoning cash to himself or to others for improper expenditures.

The trial court found the allegations of misappropriation generally meritless, noting each regularly spent "considerable" amounts of cash without accounting for it and without complaint or questions from the other party. However, the trial court found Liu breached his fiduciary duty when he used $181,800 from community funds for the Company. On appeal, Liu contends the trial court erred.

### A. Substantial Evidence Supports the Trial Court's Finding Jia Did Not Misappropriate Community Funds

Liu contends there is insufficient evidence to support the trial court's finding that Jia's transfer of $30,000 to her brother on November 8, 2016 was not a breach of fiduciary duty. The record, however, supplies substantial evidence supporting the trial court's finding.

At trial, Jia testified she traveled to China to visit her family in September 2018. While there, she drove without a license and became involved in a car accident. No one was hurt but the other car was "totaled." Because she did not want to involve the authorities, she agreed to pay 100,000 yuan, or approximately $20,000, to the other driver to compensate him for his damaged car. Her brother loaned her the money. They set

21

out the terms of the settlement on a sheet of notebook paper. Her brother loaned her an additional $10,000 to cover her other expenses while she was in China. The trial court found Jia's testimony credible and concluded her $30,000 transfer was not a breach of fiduciary duty.

Again, Liu urges us to reevaluate the evidence to arrive at a different conclusion. He contends there should have been photographs of the accident or contact information for the driver of the other car. We decline to second guess the trial court given that Jia's testimony and the paper receipt constitute substantial evidence to support its finding. (*Balcof, supra,* 141 Cal.App.4th at p. 1531.)

To the extent Liu contends the receipt lacked foundation, Jia's testimony is sufficient to establish its authenticity. (Evid. Code, § 1413 ["A writing may be authenticated by anyone who saw the writing made or executed, including a subscribing witness."]; *McAllister v. George* (1977) 73 Cal.App.3d 258, 263 [where invoice for dental services was authenticated by plaintiff's testimony that the services were performed and he received and paid the bill, "contrary inferences flowing from the facts that the bill was handwritten, not on official stationery, and signed by a student were issues going to the weight of the evidence . . . ."].) The trial court did not abuse its discretion to admit the receipt into evidence.

Liu further argues he may not be liable for any damage caused by Jia under Family Code section 1000 because she was not performing an activity for the benefit of the community at the time of the accident. The trial court expressly found "paying for damages or injury caused [in a traffic accident] is not a breach of fiduciary duty." Liu failed to object based on Family Code section

22

1000 when the trial court attributed this expense to the community. He has thus forfeited this argument. (*Avalos v. Perez, supra,* 196 Cal.App.4th at p. 776.) In any case, Liu has presented no authority for the proposition that a violation of Family Code section 1000, if there was one, is also a breach of fiduciary duty.

Liu has also forfeited his argument that Jia breached her fiduciary duty by violating Chinese law when she drove without a license. This argument is a non sequitur, in any case. Even if Jia had a license to drive in China, she would still have had to pay for the damage she caused to the other car.

## B. Substantial Evidence Supports the Trial Court's Finding Liu Breached His Fiduciary Duties

Liu contends there is insufficient evidence to show he breached his fiduciary duties by transferring $181,800.00 in November 2015 to Huan Huan Huang. The record demonstrates otherwise.

Liu testified he paid Huang to provide him with business referrals from China and she produced two brochures for him. He admitted into evidence the contract with Huang, which specified a term from July 2014 to June 2015 and required Huang to spend at least 15 days a month on the project. The contract listed the "Client (Party A)" as "Wei-Zi Liu [¶] California Long Dragon Realty." The trial court interpreted this to mean that Liu signed on behalf of Long Dragon Realty. However, Liu testified that was not the case and the contract was between him and Huang as individuals. Liu testified Huang did refer clients to him but admitted he had no records of his contacts with her or any accounting of her expenses. Liu testified he obtained a high gross income in 2014, partly as a result of Huang's referrals. He

did not produce any records showing which clients she referred to him because they were not requested during discovery.

The trial court observed there was no evidence of Huang's qualifications or credentials, how Liu came to enter into the contract with her, what clients were referred by Huang, what business or revenues were generated by Huang's referrals, or even any communications between Huang and Liu. It also noted Liu had never made any other expenditure of this size or for this kind of service. The trial court concluded it was "not fully prepared to say that the entire transaction was a sham, although the evidence would support such a finding, for the Court need not reach that issue. Even giving Mr. Liu the benefit of the doubt that the Huang transaction was really done to further his business, the expenditure is so reckless as to constitute a breach of duty." The trial court further noted the expense adversely affected the Company's valuation because it significantly reduced the Company's 2015 income. If the Company had not incurred that expense in 2015, the valuation of the Company would have been higher. The trial court denied Jia's request for penalties for Liu's breach of duty but allowed her to recover 50 percent of the amount plus interest. It also awarded attorney fees expended by Jia in proving up the breach.

Liu again quarrels with the evidence relied upon by the trial court to support its findings and urges us to reevaluate it. He contends the trial court failed to consider his contradictory evidence demonstrating it was a legitimate business expense. Given the substantial evidence supporting the trial court's findings, identified above, the trial court did not abuse its discretion to order recovery of 50 percent of the misappropriated amount.

24

In her cross-appeal, Jia contends the trial court erred when it declined to award the entire amount of $181,800 to her. Jia acknowledges an aggrieved spouse's remedy under Family Code section 1101, subdivision (g) for a breach of fiduciary duty consists of an award of 50 percent of any asset misappropriated from the community plus attorney fees and costs. However, she claims she is entitled to 100 percent of the misappropriated funds under Family Code section 1101, subdivision (h), which allows for punitive damages upon clear and convincing evidence of oppression, fraud, or malice. The trial court made no finding of oppression, fraud, or malice. Indeed, the trial court indicated it was not prepared to find the transaction a sham. Like Liu, Jia merely asks us to reevaluate the evidence. We decline to do so. (*Balcof, supra,* 141 Cal.App.4th at p. 1531.)

We likewise decline to add the $181,800 to the Company's valuation as urged by Jia. This would result in a classic case of double counting. The trial court accounted for the $181,800 amount when it awarded 50 percent of it to Jia. She would recover doubly if we were to also increase the value of the Company by that amount.

Jia additionally contends the trial court mistakenly calculated the interest for the misappropriated funds from November 2015 when the checks were dated October 29, 2014 and November 5, 2014. The testimony and evidence at trial indicated the checks were not cashed until April 2015, however. Liu testified the delay was a result of the banking system between China and the United States. Accordingly, it appears the breach did not occur until April 6 and 7, 2015, when the cash was transferred. We need not address whether interest should be calculated from April 2015, however, because Jia has forfeited

25

this issue for failure to raise the error with the trial court. (*In re Marriage of Arceneaux, supra,* 51 Cal.3d at p. 1132.) Indeed, Jia prepared the judgment and specified the interest was to be calculated from November 2015 to September 15, 2019.

## VII. Attorney Fees

The trial court declined to award Jia need-based attorney fees under Family Code section 2030, finding the parties' incomes and access to assets were roughly equal after the distribution of marital property. The court, however, awarded Jia $64,872.56 in attorney fees and costs pursuant to Family Code sections 271 and 1101,[5] finding Liu frustrated the policy of the law to promote settlement of litigation and reduce the cost of litigation. Jia challenges the denial of her attorney fees under Family Code section 2030, and Liu challenges the court's order under Family Code section 271. We affirm the attorney fees orders.

### A. Family Code Section 2030

Jia contends the trial court erred when it denied her attorney fees under Family Code section 2030. We find no abuse of discretion.

Family Code section 2030, subdivision (a)(1) provides: "the court shall ensure that each party has access to legal representation . . . to preserve each party's rights by ordering, if necessary based on . . . income and needs assessments, one party . . . to pay to the other party . . . whatever amount is reasonably necessary for attorney's fees and for the cost of

---

[5]    Liu also requests we reverse the Family Code section 1101 attorney fees award if we reverse the trial court's ruling as to the breach of fiduciary duty finding related to the Huang transaction. Since we affirmed the trial court's determination on this issue, we decline to reverse the corresponding Family Code section 1101 attorney fees award.

26

maintaining or defending the proceeding . . . ."  In addition, "the court shall make findings on whether an award of attorney's fees and costs . . . is appropriate, whether there is a disparity in access to funds to retain counsel, and whether one party is able to pay for [the] legal representation of both parties."  (Fam. Code, § 2030, subd. (a)(2).)  "If the findings demonstrate disparity in access and ability to pay, the court shall make an order awarding attorney's fees and costs."  (*Ibid*.)  The factors to be considered in determining the relative circumstances of the parties include, to the extent relevant, those used for determining spousal support, enumerated in Family Code section 4320, including "[a]ny other factors the court determines are just and equitable."  (Fam. Code, § 4320, subd. (n); see Fam. Code, § 2032, subd. (b).)

We review a trial court's attorney fees determination under Family Code section 2030 for an abuse of discretion.  (*In re Marriage of Ciprari, supra,* 32 Cal.App.5th at pp. 111–112.)  Its findings will be upheld if supported by substantial evidence.  (*Ibid*.)

The trial court declined to award Family Code section 2030 attorney fees based on a finding the parties' salaries and assets were "roughly the same."  Substantial evidence supports this finding.  Jia's annual salary ranged from approximately $110,000 in 2017 to $120,000 in 2019.  Although Liu's commissions exceeded Jia's salary, the trial court found Jia was "already getting that money" through the division of goodwill from the Company.  The trial court explained the excess earnings model used to value the Company subtracted out a reasonable salary for Liu (which the trial court found to be roughly equal to Jia's salary) and attributed the excess to goodwill.  As a result, Jia's receipt of half of the Company's goodwill equalized any

27

discrepancy in their assets. The court also noted Liu testified he earned no commissions in the first four months of 2019.

Jia contends the trial court failed to take into account the fact that she lacked access to the assets during the litigation and trial because those assets had not yet been distributed. Thus, the trial court's finding that their incomes and access to assets were equalized by the distribution of goodwill was unsupported. We disagree.

The record shows Jia had access to funds during the litigation. She testified she was able to borrow money from her brother and she continued to earn roughly the same salary as Liu during this time period. (*In re Marriage of Smith* (2015) 242 Cal.App.4th 529, 533 [trial court may consider loans former wife received from her father when considering the relative positions of the parties for purposes of award of attorney fees].) Indeed, she earned more than he did in the first part of 2019. Given these facts, we cannot say the trial court abused its discretion to deny Jia attorney fees under Family Code section 2030.

**B. Family Code Section 271**

Liu contends insufficient evidence supports the imposition of Family Code section 271 sanctions. We disagree.

**1. Applicable Law**

Family Code section 271, subdivision (a) provides: "Notwithstanding any other provision of this code, the court may base an award of attorney's fees and costs on the extent to which the conduct of each party or attorney furthers or frustrates the policy of the law to promote settlement of litigation and, where possible, to reduce the cost of litigation by encouraging cooperation between the parties and attorneys. An award of attorney's fees and costs pursuant to this section is in the nature

28

of a sanction. In making an award pursuant to this section, the court shall take into consideration all evidence concerning the parties' incomes, assets, and liabilities. The court shall not impose a sanction pursuant to this section that imposes an unreasonable financial burden on the party against whom the sanction is imposed. In order to obtain an award under this section, the party requesting an award of attorney's fees and costs is not required to demonstrate any financial need for the award." (Fam. Code, § 271, subd. (a).)

"The imposition of sanctions under section 271 is committed to the sound discretion of the trial court. The trial court's order will be upheld on appeal unless the reviewing court, 'considering all of the evidence viewed most favorably in its support and indulging all reasonable inferences in its favor, no judge could reasonably make the order.' " (*In re E.M.* (2014) 228 Cal.App.4th 828, 850; *In re Marriage of Corona* (2009) 172 Cal.App.4th 1205, 1225–1226.) We review any findings of fact that formed the basis for the award of sanctions under a substantial evidence standard of review. (*In re Marriage of Feldman* (2007) 153 Cal.App.4th 1470, 1479.) It is not the function of the reviewing court to decide questions of fact or credibility. (*In re E.M., supra*, at p. 851.)

### 2. Proceedings Below

In her request for attorney fees and costs under Family Code section 271, Jia alleged Liu refused to cooperate in the litigation, including objecting to reasonable subpoenas for bank records, propounding excessive discovery (253 requests for admission alone), and rejecting multiple reasonable settlement offers made prior to trial. Jia set forth the settlement offers she made as to specific contested issues and demonstrated that in

29

most of these issues, the settlement offer was more advantageous to Liu than what he ultimately received at trial.

At the hearing, the trial court asked Liu whether it was true his lawyers propounded hundreds of discovery requests at a time to raise the costs of litigation. Liu responded, "That was what my previous attorney did." He elaborated that he had "no idea" why they did that but acknowledged he was responsible for their conduct. However, he denied he unreasonably refused to settle, asserting he relied on his expert's valuations and conclusions to conclude Jia's settlement offers were not acceptable.

The trial court found "[t]his case was over litigated . . . . There was a war of attrition going on, hundreds of discovery requests at a time. It wasn't warranted. I don't think the case had to go to trial. The expert opinions were not that different." The trial court ordered Liu to pay to Jia a total of $64,872.56 in fees and costs comprised of $3,549 in attorney fees and costs under Family Code section 1101 and $56,313.76 in attorney fees and costs plus $5,000 in expert fees under Family Code section 271.

### 3. Substantial Evidence Supports the Trial Court's Award under Family Code Section 271

Liu contends a fee award under Family Code section 271 is not warranted because Jia failed to produce any evidence, much less substantial evidence, to show his litigation conduct violated the law or any court order. Yet, Liu acknowledges his counsel propounded 253 requests for admissions and that none of the information gleaned from those requests was used at trial. He also does not deny he objected to deposition subpoenas and failed to produce all documents requested during discovery. His own

30

admissions regarding his failure to cooperate in discovery and his excessive discovery requests are substantial evidence supporting the trial court's finding.

Additionally, the trial court impliedly disbelieved his explanation that he refused to settle based on his expert's valuation of the marital property when it observed the parties' expert valuations were "not that different." We do not reweigh the evidence or judge credibility on appeal. Given these facts, we cannot say the trial court abused its discretion to order attorney fees and costs under Family Code section 271.

We also decline to consider Liu's unsupported assertion on appeal that the fee award imposes an unreasonable financial burden on him. The trial court implicitly decided against Liu on this issue, and Liu has presented no factual or legal authority to demonstrate the trial court prejudicially erred to impose the sanctions. (*In re Marriage of McLaughlin, supra,* 82 Cal.App.4th at p. 337.)

## VIII.  Judgment

Lastly, Liu asserts portions of the judgment do not conform to the final statement of decision or the parties' stipulations. We do not read Liu's argument as merely an attempt to correct clerical or typographical errors in the judgment. Instead, Liu again attempts to reargue the facts in raising this issue. For example, Liu contends Jia double counted his Porsche Macan by awarding it to him as separate property in the judgment and requiring Liu to pay Jia an equalizing payment of $12,000 while simultaneously including the Porsche as a tangible asset in her expert's valuation of the Company. Liu had the opportunity to raise this issue at trial but did not. Neither did he attempt to

raise it as an objection to the proposed statement of decision.[6] Liu does not get a third bite at the apple. He has forfeited these arguments. (*In re Marriage of Arceneaux, supra,* 51 Cal.3d at p. 1132.)

Liu obliquely addresses the issue of forfeiture by arguing he filed objections to the proposed judgment. Those objections were untimely. A party has 10 days after service of the proposed judgment to serve and file objections to it. (Cal. Rules of Court, rule 3.1590(j).) The objections were filed on September 20, 2019, more than 10 days after the proposed judgment was served on him by electronic mail on September 5, 2019.[7]

## DISPOSITION

The judgment and the attorney fees orders are affirmed. Jia to recover her costs on appeal.


BIGELOW, P. J.

We concur:



GRIMES, J.            WILEY, J.

---

[6] By this observation, we do not intend to decide whether such an objection would have been timely.

[7] Because we determine the objections were not timely, we need not reach the issue whether objections to a proposed judgment may properly be made when a statement of decision has been requested and a party has previously submitted objections to the statement of decision.

32